Good morning, your honors, and may it please the court. I'm Stephanie Adractis, and I represent the petitioner Randy Skains. This case concerns the prosecutor's duty to correct false evidence that it knows or should know is false. And that duty is part of the government's obligation to ensure a fair trial. In this case, the warden has argued that Mr. Skains has not proved that testimony that was admitted at his trial was false. And that is incorrect. The parole officer, Mr. Mills, who was presented in the prosecutor's rebuttal case, clearly testified that Mr. Skains and the decedent, Mr. Miller, were not housed in F wing together when they were incarcerated. The prosecutor had previously set up this impeachment of Mr. Skains during his cross-examination of Skains at trial. He specifically asked Mr. Skains, isn't it the case that you were not housed in F wing together, and Mr. Skains said that they were. This was an important part of Mr. Skains' testimony in his own defense. He asserted that this conversation that he had with Mr. Miller was essentially the beginning of a sequence of events where Miller threatened the life of Skains' girlfriend, Charlotte, as well as her daughter. It was important testimony because it tended to show that Mr. Skains' fear that Miller would act on these threats was well-founded and serious, and in impeaching Mr. Skains with the specific and discreet information that led the jury to believe that he was lying about being in the same wing as Miller was devastating to Mr. Skains' credibility. That's where I have some problem because there's no dispute, as I understand it in the record, that the two could have talked no matter where each was housed. So it's clear that they could have talked through the window, which is what he said happened anyway, or through the whatever. And in addition, even when everything was explored in full, it only turns out that they were housed together on a day that wouldn't have mattered anyway, because that's not the day on which Mr. Skains said the conversation took place. So I have a — I mean, wholly apart from other substantive evidence, just on this topic alone, it seems to me difficult to conclude that it was important, it was collateral, and the heart of the matter was never in dispute, that they could have had this conversation. Your Honor, I examined that testimony closely on the point you raised about the dates. And when Mr. Skains was asked at trial, was the 8th the day that this happened, he said that he wasn't sure exactly, but that's where he wrote it on the calendar. Well, sure. But, you know, you might have miswritten 9th or 10th or 11th or even 7th, but 20th? Your Honor, I understand the Court's point. And I — it wasn't clear to me, however, that he was asserting that when he wrote the note down, he meant to record that as being the exact date. Don't let me get you off on that so much as my point is it was really undisputed that the conversation could take place. In other words, there is no doubt that housing, whether they were housed in the same unit or not, was not the critical fact to their having a conversation. It was argued that they could have seen each other in passing. I think there are two issues with that. One is that if Miller, as Skains testified, made an offer to Skains to pay him $3,000 in a motorcycle to murder two people, it's a conversation that I would submit is less likely to happen in passing and is a lot more credible if it was happening when they were in the same wing together and could have had some privacy because of the nature of the conversation. And the second issue is that when the prosecutor employed this testimony at the time that he argued it in closing argument, he very clearly focused on the inconsistency between what Skains said about being housed together and Mills' testimony that they weren't. And he said to the jury, you know, we didn't just bring Mr. Mills in here to hear him talk. You know, he told you that they weren't housed in F wing together, and that's what Mr. Skains told you. So he was impeaching him in a way that suggested that it wasn't collateral and that the jury should disbelieve Skains' testimony in its entirety because, in essence, he lied about being housed with Miller. Is there anything other than your belief to indicate that the prosecutor knew that Mills' testimony was false? Your Honor, I attempted to depose the prosecutor in the district court proceedings, and that was denied. So I cannot say that I know one way or another what the prosecutor knew, although in looking at the pleadings filed in the motion for a new trial, I think it's clear that there was some knowledge by the time that motion was argued because substitute counsel for Mr. Skains, here a second lawyer examined those documents on his behalf and asserted in his papers this was false testimony, that those records do show that Skains was in F wing. And the response filed by the trial prosecutor avoids that issue entirely, doesn't address it, instead says, oh, we didn't really call him to testify about that issue. We called him to testify about prison procedure. If you look at the direct examination of Mills at trial, that is absolutely not why he was called. The only subject that he was questioned about on direct by the prosecutor was whether or not Skains and Miller were in F wing. So at that point, I believe that tends to show there was some knowledge there that the prosecutor, at least by the time the new trial motion was argued, had investigated this and knew that it was not true. And at that point, at minimum, this matter should have been litigated in the trial court on that basis. Instead, the prosecutor avoided the issue. And throughout these proceedings, there has been absolutely no allegation by the government that Mr. Ward and Vasquez's declaration concerning the truth of the matter is incorrect. They just have simply not submitted any evidence disputing that. And I believe it's absolutely the case that they were housed together, as shown in the records. And going to the issue of materiality, which is an issue that the district court focused on, I think it was simply incorrect to assert that Mr. Skains's defense was impossible was an impossible defense. And in looking at California law on self-defense, on defense of other people, Mr. Skains testified at his trial. He testified that when he was fixing the truck, that Miller had been repeatedly threatening the two women, the girl and the woman that Skains sought to protect, that he struck Skains from behind, that they got into a fight. Under California law, Mr. Skains was allowed to respond with force when he was attacked, and that was his testimony. The trial arguments tended to focus more on Skains's desire to protect Charlotte and her daughter and less on Skains's desire to protect himself, but it's clearly there. The decedent, Mr. Miller, had two knives in his possession. We know that because the police had responded earlier when Skains had tried to get Miller arrested. And so Miller was a threat to Skains. According to Skains, he attacked him in the parking lot. There's no dispute about that. The only civilian witness who saw the fight, the only other witness, did not see the whole thing and thought that what he was looking at was a fistfight, did not even realize that it was a stabbing. So the only detailed description that we have of the fight and of the incident was from Mr. Skains. I think it's significant as well that Mr. Skains's defense was the subject of instruction by the Court. If it was really an impossible defense as the magistrate reasoned, then why did the judge instruct the jury on self-defense and defense of other people? The jury clearly considered that defense because they issued the two questions that they did, and one in particular going to whether or not this imperfect self-defense theory would also go to other people. And on the question of imminence and imminency, the only California case I found, Michaels, that deals with imminency when the people are not physically present, dealt with a person who was in an institution at the time that the fears about some kind of threat of violence were supposedly taking place. And here, the physical proximity of Miller to the two potential victims is something that is not clear in the record. We know that they're all in the same small town, and Miller was saying he was going to go and get them right now. This purported conversation in prison that we've been talking about, is that relevant and probative to the defense of self-defense or only to the defense of defending others? I think it's relevant and probative to both. More particularly to the defense of others because it's a direct threat of the others. But when you're emphasizing self-defense, doesn't that diminish the force of the argument you were making earlier? I think not because when one is defending oneself under California law, one is allowed to take into consideration everything that you know about the other person's propensity for violence. And so given that, Miller knew that or I'm sorry, Miller had made direct threats, consistent, credible threats with a motive to kill. And what was Miller serving time for in prison during the purported conversation? Both of them. I'm sorry, Your Honor. Both of them at the time that they were in DDI, the dual institute, were in on probation or parole violations. And I don't know what the nature of Miller's violation was. I can't say that right now. But I believe that that incident in F wing went to both of those defenses. And because Miller had such a strong motive to act on the threats that he made, the reasonableness of Mr. Skanes' response was a jury question and it should have been decided based on a real and fair assessment of Mr. Skanes' credibility on that. And I think Mr. Skanes' report. You're over. Oh, I'm sorry, Your Honor. Thank you. May it please the Court. Barton Bowers, Deputy Attorney General for the State and the Warden. Mr. Skanes' testimony at trial. I say that based on the evidence that Mr. Skanes' testimony at trial provided. You can look at the evidence that Mr. Skanes' testimony provided. Acceptance of this claim of false evidence requires a belief that this was material or devastating, as Mr. Skanes puts it, impeachment of Mr. Skanes' testimony at trial. It was, in fact, highly collateral. And I say that based on looking at all the evidence that was presented in this case, starting with the independent witness, Mr. Roeffler, who did have the chance to observe this fight, and he saw an unequal fight. He saw Mr. Skanes attacking, slashing at, hitting at Mr. Miller while Mr. Miller was backing up, putting his hands in front of him, telling him to stop. He backed up 50 feet, and Mr. Miller went down to the ground on his hands and his knees, put his face on the ground, and 30 seconds later, Mr. Skanes came up and reached underneath his belly as if to deliver the coup de grace. And, in fact, it was one of his wounds to his belly, to his abdomen, that was one of the potentially fatal wounds of the 16 wounds that were delivered to Mr. Miller while Mr. Skanes had no wounds himself. So there's the physical evidence, there's eyewitness evidence, and there's also the impeachment evidence by prior convictions, because Mr. Skanes admitted on the stand that he had been convicted before of terrorist threats, possession of a firearm by a felon, burglary, oral copulation of a minor, and twice for vehicle theft. And so by his own admission at trial, he was a felon, a thief, a burglar, and a sex offender. And it's much easier to believe that the jury rejected all of Mr. Skanes' self-serving testimony on the basis of his prior criminal history and not on the basis of the fact that Parole Agent Miller said they weren't housed together in the same wing when, apparently, if Mr. Skanes' evidence is to be believed, they were, in fact, housed together on the same day, January 25, 2000, which is more than two weeks after this entry in Mr. Skanes' diary, the diary that was admitted into evidence that had the notation January 8, 2000, motorcycle, money, take care of Mr. Miller's problem. Now, Mr. Skanes criticizes the district court's conclusions regarding California law on imminence. The problem is not the district court's conclusion. It's the conclusion of the state court, which found that this doctrine of imperfect self-defense of others could not possibly be entertained as a matter of California law under the facts of this case. It found that there was no way Mr. Skanes could have believed that the threat to the Prentiss's was imminent. And the reason was they were not present at the scene. And Mr. Skanes says the physical proximity of Miller to the victims is not clear. The court of appeal found as a factual matter that the Prentiss's were not at the scene. They were not there. And Mr. Skanes has offered no clear and convincing evidence that's required under AEDPA to overcome that factual finding. Now, I know the Court's very busy today, so I'll just ask, unless there are specific questions I can be helpful on, the warden is prepared to submit and ask that the district court judgment be affirmed. Nothing for me. Thank you. No, I think the case has been well briefed, so we're fine. Thank you very much. Okay. Thank you all. The case is submitted. Thank you for the arguments.
judges: Ripple, Rymer, Fisher